Watkins C. JOHNSTON and Wife, Edith R. Johnston, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 1515–N.

United States District Court
M. D. Alabama, N. D.

Jan. 8, 1960.

Rushton, Stakely & Johnston, Montgomery, Ala., for plaintiff.

Charles K. Rice, Asst. Atty. Gen., James P. Garland, Myron C. Baum, Garry A. Pearson, Attys., Dept. of Justice, Washington, D. C., and Hartwell Davis, U. S. Atty., Montgomery, Ala., for defendant.

JOHNSON, District Judge.

This cause is now submitted to the Court upon the issues made by the pleadings and proof. Upon consideration of the evidence, consisting of the oral testimony of several witnesses and the written briefs of the parties, this Court now proceeds in this memorandum to make the appropriate findings of fact and conclusions of law.

The plaintiffs, as husband and wife, claim of the United States the sum of $2,454.82, with interest from September 24, 1958, due by reason of Federal income taxes having been, according to their contention, erroneously assessed and collected by the United States from them for the calendar years 1955 and 1956. The record reflects that after plaintiffs determined and paid what they considered to be the proper tax for those years, the defendant assessed additionally and plaintiffs paid additionally for the year 1955, $1,680.32, and for the year 1956, $1,017.70. (No claim is made for the refund of $243.20.)

It is stipulated and agreed by and between the parties that plaintiffs, within the time provided, filed an appropriate claim for refund and that said claim for refund was disallowed on March 17, 1959.

The basis for the defendant's additional assessment was the manner in which plaintiffs determined the salvage value of certain brood cows sold by plaintiffs during the tax years in question. The plaintiffs are, and have been since 1947, engaged in breeding and selling cattle in what is commonly referred to as a "cow and calf" operation; the operation is carried on from their farm located in Lowndes County, Alabama The plaintiffs commenced this cattle operation by purchasing a large number of breeding cows and a few bulls; the operational plan was and is to keep the breeding cows as long as they are productive and when they would reach the nonproductive stage to dispose of them as "culls"; the productive life of the cow varies, both with the individual animal and with the particular operation. In the plaintiffs' operation, as opposed to the usual operation, the cows are, in many instances, kept for ten and eleven years. The price received for these "cull" cows varies according to the age, weight and physical condition. This ranges from nothing, if the cow is diseased and sold for tankage, to as high as 15¢ per pound; the average weight of such "cull" cow is approximately 750 pounds.

In certain instances, the cows obtained for breeding purposes prove to be infertile and therefore incapable of producing calves. These animals are termed "heiferettes." From 1947 through 1955, the plaintiff-taxpayers actually sold few, if any, "cull" cows. They did, however, sell a considerable number of heiferettes that they had unwisely permitted to accumulate as a part of their herd. The prices received for the infertile, but otherwise healthy and fat heiferettes far exceeded the market price obtainable for "cull" cows.

Since 1951, the plaintiff-taxpayers consistently followed an eight-year estimated life for their breeding cattle. In computing their depreciation allowance on the breeding cattle purchased, as opposed to those born and raised on the plaintiffs' farm, for the years 1955 and 1956, plaintiffs deducted $\frac{1}{8}$ ($12\frac{1}{2}\%$) of the cost of the purchased cattle, with the last year not being taken as depreciation, but being considered as the salvage value of each animal.

The defendant, after an examination of the plaintiffs' operation by the agents of the Internal Revenue Service, deter-

mined that plaintiffs' method for determining the salvage value of their brood cows was an unreasonable method and proceeded to reconstruct the salvage value by using the plaintiffs' own sales records to arrive at an average price per animal at the end of its useful life. The Commissioner, acting upon the findings of the investigative agent, determined the salvage value for each animal to be $100. This figure was arrived at by considering sales by the plaintiffs of cattle, including a large number of heiferettes; as above stated, the sale value of such cattle bears no relation to the salvage problem herein involved.

The term "salvage", as it is properly defined in instances such as this one, is the amount, determined at the time of the acquisition, which is estimated will be realizable upon sale or other disposition of an asset when it is no longer useful in the taxpayer's business and is to be retired from service. There is no question but that in cases such as this one, the burden is upon the taxpayer not only to satisfy the Court that the Commissioner of Internal Revenue made an erroneous determination but also to satisfy the Court that the method adopted by the taxpayer of handling the acknowledged difficult task of salvage is reasonable under all of the circumstances. From the evidence in this case, this Court cannot but conclude that the Commissioner's determination, based upon sales other than "salvage" cows is an erroneous one and is an unreasonable approach to the salvage problem in this case. This Court also concludes that plaintiffs have sustained the burden of satisfying the Court that their method is, under all of the circumstances involved, a reasonable one. This Court further concludes that the plaintiffs are entitled to a judgment from the defendant in the amount of $2,454.82 with interest from September 24, 1958.